STERLING & WELCH CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 14141.   Promulgated March 18, 1929.

*Claude W. Dudley, Esq.*, for the petitioner.
*Maxwell E. McDowell, Esq.*, for the respondent.

928

OPINION.

LITTLETON: The issue here presented arises as the result of a reduction by the Commissioner of petitioner's invested capital for 1920. In determining .petitioner's surplus at January 1, 1920, the Commissioner increased the depreciation reserves applicable to depreciable assets in the amount of $101,512.52, and made a correspond-. ing reduction in surplus of the same amount. This, the petitioner contends, is error for the reason that it represents a reduction in surplus as reflected by petitioner's books. The returns of the petitioner from 1909 to 1919, inclusive, were introduced in evidence, and show that the depreciation claimed on its returns from 1913 to 1919, inclusive, is in substantial agreement with the evidence submitted as to that written off on its books for the same period, but that for the period 1909 to 1912, inclusive, the total amount claimed as deductions on its excise-tax returns was $163,702.78, whereas the amount written off on its books for this same period was much less than this amount. While we do not know the exact amount written off on its books for depreciation in 1910 and 1911, we do know that in 1909, $25,542.36 was claimed as a deduction on its return and only $2,829.46 set up on its books; that in 1912, $46,485 was claimed as a deduction and only $8,172.37 set up on its books; and that, similarly, the amounts claimed as deductions in 1910 and 1911 were much in excess of the amounts set up on its books. It also appears that the amount by which the Commissioner had reduced surplus at January 1, 1920, is substantially less than the excess of deductions for depreciation on the returns from 1909 to 1919, inclusive, over that shown on its books for the same period. Little evidence was furnished as to the depreciation actually sustained to January 1, 1920, other than may be deduced from the books and returns.

The petitioner's secretary and treasurer, who had been with the company since 1902, did testify that in his opinion the depreciation written off on the books to January 1, 1920, was sufficient to take care of the depreciation accrued to that date, though this is difficult of reconcilement with other evidence submitted. He testified that the amount of depreciation written off each year was determined upon at a conference with the president, vice president and himself (this witness). While he stated that the final decision was made by the president and vice president, he stated that he agreed with their

opinion and judgment. He further testified that the policy of the petitioner had always been to keep everything in excellent repair, making no distinction with respect to the different years, and stating specifically, in reply to a question, that this policy had applied to the Euclid Avenue Building from 1910 to 1919. He stated, further, that charges for repairs were made to expense accounts, and that "discarded, junked or replaced" items were charged against the depreciation reserve. While no definite evidence was furnished as to costs, beginning in 1909, it does appear that the greater part of the total costs of $887,995.38, appearing in the depreciable assets at January 1, 1920, was represented by the cost of the Euclid Avenue Building in the amount of $706,580.37. This building was completed, equipped and placed in use in 1909, and the earliest cost shown in the returns is for 1915, where we find a cost of $655,000. No substantial additions were shown between 1915 and January 1, 1920, when the cost for this building was shown at $706,580.37. The cost of fixtures and machinery on January 1, 1910, was $56,399.20. The total capital costs on which depreciation was claimed in 1914 was $858,629, as compared with $887,995.38 at January 1, 1920. From these facts we think it is fair to say that there was no great increase in capital costs on which depreciation was claimed from 1909 to 1920, yet when we examine the depreciation written off on the books, we find a variation from $2,829.46 in 1909 and $8,172.37 in 1912 to $47,838.47 in 1919. From the evidence which this witness gave as to the care of the properties, it is difficult to see how we can attach much weight to his opinion that the depreciation shown on the books at January 1, 1920, was that accrued to that date, when he also testified that the depreciation written off on the books each year likewise represents the depreciation sustained in each year. Besides, he was not testifying as an expert on depreciation, but only as an officer of the company. We understand this testimony to mean little more than a statement of what depreciation was written off in each of the years. Certainly, it affords little aid in determining that the depreciation written off was that sustained.

We are then left with little more than the books and returns as a basis for determining the correctness of the Commissioner's reduction. The petitioner seems to consider it to be the rule of this Board that the mere presentation of the books, reflecting a given surplus and depreciation reserve, is sufficient to overcome the *prima facie* correctness of the Commissioner's determination and to require the Commissioner to go forward with the burden of proof. But we do not understand this to be the case. In *Mandel Brothers*, 4 B. T. A. 341, where a similar contention was made, the Board said:

The Commissioner has determined that a 2 per cent rate for all of the years 1909 to 1920, is reasonable. The taxpayer has not rebutted the *prima facie*

case by the mere production of its books. These show only that the return correctly reported the book entries. A line of reasoning which concluded that the presumption of the correctness of the Commissioner's determination is rebutted by the production of the very evidence which the Commissioner examined and found to reflect an unreasonable allowance and so found not from the books themselves, but from the surrounding circumstances, would be most peculiar. The Commissioner's allowance does not contradict the fact of what the books showed. It is the determination of a "reasonable allowance," and the burden is upon the taxpayer to rebut the presumption of the correctness of that determination.

The aforementioned case also distinguishes cases of the type of *Cleveland Home Brewing Co.*, 1 B. T. A. 87; *Russell Milling Co.*, 1 B. T. A. 194, and *Rub-No-More Co.*, 1 B. T. A. 228, upon which petitioner places much reliance, from cases where there was no substantiation of the book entries as reflecting depreciation actually sustained. In any event, depreciation is a question of fact, and what is shown by books is only evidential and not conclusive. *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179. Besides, is it not reasonable to say that what the books show in this instance is weakened, as evidence of depreciation actually sustained, by the fact that from 1909 to 1912 the petitioner deducted a much greater amount as a "reasonable allowance for depreciation" on its return than that set up on its books? The explanation offered to the effect that the petitioner did not appreciate the significance of such a deduction is not convincing. The petitioner's secretary and treasurer, who was one of the committee of three who determined this allowance, testified that this was arrived at as the result of the application of specific rates to various types of property, using 2 per cent in the case of buildings and 10 per cent in the case of machinery, which is fairly consistent with the rates claimed in returns for the more recent years. The word "depreciation" is not of uncommon usage in the everyday parlance of the average business man, and from the manner in which the deductions on petitioner's returns from 1909 to 1912 were determined, we are convinced that its officers were fully conversant with what they were doing when they sought to determine a "reasonable allowance for depreciation." When looked at in this light and consideration is given to the great difference between the amount set up on the books from 1909 to 1912 and that deducted on the returns for the same period, would it not be tantamount to imputing fraud to petitioner to say that the amount set up on the books represented what the officers considered the correct depreciation sustained for these years, rather than that claimed on the returns? And, too, such information as we have as to the cost of the depreciable assets and their estimated life as reiterated on several returns, together with evidence as to repairs and maintenance, would tend to discredit rather than substantiate the depreciation reserve as reflected by petitioner's books. In other words, have not the

petitioner's acts and statements in its returns impugned the correctness of the very books which it asks us to accept in lieu of a determination by the Commissioner which we, under our rules of procedure, must accept as at least *prima facie* correct? We think so.

By the foregoing, we do not purport to find that the depreciation sustained to January 1, 1920, is as found by the Commissioner. What we do find is that evidence submitted does not show that the depreciation as set up on the books is correct, nor is it of such character that we can determine what depreciation was sustained. Under such circumstances, there is no alternative than to sustain the Commissioner, even though we are not informed as to the basis of his determination.

*Judgment will be entered for the respondent.*